The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oye, oye, oye, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Thank you. Counsel, it's remote. Can you hear us? Yes, I can. Can you hear me as well? Yes, very well. Thank you. You may proceed. Thank you, Your Honor. May it please the Court. Diana Stavrilakis, Court-Appointed CJA Counsel, on behalf of Mr. Dadisman, and I would like to reserve five minutes for rebuttal, please. So noted. The issue before the Court today is whether the District Court erred in denying Mr. Dadisman's motion to suppress physical evidence where that evidence was obtained in violation of his Fourth Amendment rights. And the underlying triggering event in this case was a traffic stop. And since a traffic stop is considered a seizure under the Fourth Amendment, it is reviewed for reasonableness based upon the standard announced in Terry v. Ohio, a two-prong test, first, whether the initial stop was lawful, and if so, whether the officer's actions thereafter were related to the scope and circumstances that justified that stop. And we would present to the Court that the District Court concluded that the stop in this case was reasonable because the parties agreed that Mr. Dadisman did not have a valid license plate on a motorcycle that he was riding, and that's what initiated the traffic stop, and that the officer's actions thereafter in detaining Mr. Dadisman until a K-9 unit could arrive on the scene were reasonable because of that length of time, that it was de minimis. And I would ask the Court to consider the factual circumstances that led up to this traffic stop, and I think this is fairly conceded within the government's brief throughout their argument that this was never really about stopping Mr. Dadisman because of an invalid license plate. This was always about the Barber County Sheriff's Department investigating drug activity in that area, and they had tips or information that Mr. Dadisman was a big player, and they wanted to approach him and make contact and hopefully ultimately get more evidence to support a search warrant to go to his residence where they had information there was drug activity occurring. But that is – Counsel, can I – you're not suggesting or are you suggesting that there's a constitutional problem with what you've just outlined, I think? There is not a problem with that. So they used this pretext to stop him. So what do you think was the problem? If it's not the pretext, why don't we get to the part that's the problem? So the problem is after they do this valid stop, which is based on this invalid license plate, after they take whatever law enforcement steps are necessary, there has to be some reasonable suspicion to hold Mr. Dadisman at that location, which in this case was the gas station where they approached him. There has to be a reasonable suspicion that there's drug activity right at that time to hold him until this canine unit arrives. And Mr. Dadisman is arguing that there was no reason to hold him further, that he was detained and there was no reasonable basis to do so at that point in time. Counsel, did you understand the district court to have asked and answered that question? Did the district court, in your view, apply the right standard and then decide, okay, there needs to be reasonable suspicion to hold someone for 10 minutes and there was reasonable suspicion here? I don't think the district court went into whether there was reasonable suspicion for the entire 10 minutes. I think the court looked at the fact that that wasn't a very long length of time, number one. And number two, Mr. Dadisman couldn't have driven away anyway because he didn't have valid license. So I think the court now has to go back and review the facts that we had available to us through both the testimony of the suppression hearing and what was visible on the Sheriff Carpenter's video cam to see if that supports this 10 minute period of time where nothing is happening to, you know, advance the whole reason why they stopped Mr. Dadisman and they're just waiting there literally for a canine unit to arrive. Counsel, the way you give the facts, I must've missed some of the facts in this case. It seemed that you suggested they stopped him and then held him for 10 minutes solely because of suspicion of drugs, but didn't something else happen to, they found out that the vehicle or since the vehicle, the bike he was riding did not match the registration for that vehicle. Is that correct? It's my understanding. That was the reason why Sheriff Carpenter initiated the stop. He received information over a cell phone call with another deputy Sheriff that the license plate was not valid. So that's why he followed him into the gas station, pulled up behind him and activated. So you don't dispute, you don't dispute that, right? I don't dispute that. And if you don't dispute that, then you also, do you agree that they could impound the bike? They could have. Yes. So you suggest that then that you could impound the bike in less than 10 minutes? Well, I actually don't know how long it takes to impound the bike, but I do know that you have some ideas. So, so I don't know how long it takes to impound the bike. I don't know how long it would take to do that. What didn't they impound the bike? Well, if you're watching the video, no, no, I'm not watching the video, but did they impound the bike? Ultimately one of the officers drove away on the bike. Yes. Right. Okay. So, so you're saying that, so it wasn't just the suspicion of drugs during that 10 minute was also the fact that he was riding a bike that didn't master registration. So you said that was unreasonable, 10 minutes, then they could clearly hold him just for that. And we've got plenty of cases say, why are they holding for something else? They can bring a dog. Well, I guess the problem I have, your honor, I'm sorry. I don't mean to interrupt you.   You go ahead. So after, you know, the initial contact is made between Sheriff Carpenter and Mr. Gattisman. And shortly after that, over the length of this, the whole thing was about 15 minutes, but during the length of that time, ultimately there are six officers that descend on the scene. The officer that ultimately drives away with the bike is on the scene the whole time, not the whole time. I apologize. He shows up and he's standing. He's a plainclothes detective. You know, he's not in uniform that day. So if that's impounding it, you know, waiting for someone to drive it away, that officer had been standing there in the video for the, for the 10 minutes that they waited. So there was no, what else were they waiting for? We're doing okay. Fair enough. Well, they did have to write a ticket, correct? But they did, but they did not issue a citation. They don't, they don't have the question is they could have based on what they found and they stopped and write a ticket. Correct. That's correct. And you're saying that to write a ticket could have been done in less than 10 minutes. I believe so. Yes. Well, as a whole carpenter already had the information. Can you sign a case that we'll, I'm sorry. Can you sign a case in the fourth circuit where we found that? That it doesn't take 10 minutes to write a citation. Someone took 10 minutes or less to write a citation. And we said that that was a delay. I don't have a case for that particular point, but I would note the United States versus D'Angelo where there was a similar, somewhat similar factual circumstances where an individual was stopped under a pretext for a traffic violation, but ultimately it was to further the officer's drug investigation. And that's a 10 minute stop. And this court said in that instance, that that was too much of a delay to dispense with what needed to be done. And that's why they were delaying it for the K-9 unit to show up in that case. Did they pull him over for a traffic stop? Same situation as here. In that situation, it was apparently for tailgating driving too close to the car in front of it. But there was to my recollection, no citation issued in that case either.           But the ensuing conversation between that officer and that defendant focused on the drug investigation, which is similar to what happened in this case, while they're waiting on the scene, there's no ultimately six officers present. They just use that opportunity to keep asking Mr. Datisman if he had drugs on him, if, if he's honest, they'll work with them there, you know, they're willing to work with him about it. So in my view, there's no reason after they they've stopped him, you know, they can cite him. There was someone there to drive away on the bike. They had been waiting there the whole time. There's no further reason to wait there other than they were waiting for the K-9 unit to arrive. Okay. Now counsel, there was a gun involved, correct? Not an illegal gun, but nonetheless, the gun that they had to run a record check on. Isn't that correct? It's you're right. There was a, Mr. Datisman did alert them that there was a gun on the bike. Correct. So that took up about a third of, of the 10 minutes. Did it not seems to me that we're left at least from looking at this record with about six and a half minutes that Mr. Datisman has to argue about not the three and a half where the police were involved in actually stopping him for the infraction for checking the gun and making sure that it wasn't an illegal gun. So we're down to six and a half now was Mr. Datisman at this point in time, in your view, could he have walked away since he was only being held on a traffic infraction and he wasn't stopped on the side of an interstate highway. He was stopped in a place. He could have walked away from. And my response to that would be, and I'm sorry, I don't want to, did you want to finish? Excuse me? I didn't mean to interrupt you. I didn't know. That's okay. No, it's hard. It's hard even in person.  I'm sorry. I apologize. So my, my response then is that there's a show of authority, you know, after the initial stop, six different officers arrive from throughout Barbara County. So with that presence on the scene, I don't think any reasonable person would have felt free to leave that he would have started to walk. There's six officers there that are all armed. That could have stopped him. Did your client admit to have illegal drugs? After the canine unit arrived and the Raptor, the canine officer did alert to a hit at the back of his bike. Then he did admit that he had the drug should correct your honor. After he hit, he didn't say anything about it. He had some meth on him before the hit. So I don't think he admitted to that. The report didn't make any. You sure about that? The court did make any certain finding about there was conflicting testimony about that. And so the court didn't make any. Finding about that statement. But. It doesn't have to make a finding on the statement for, in terms of what didn't he say? That was the asked, do you have any drugs? Didn't he say he did or not? He did. The dog. The dog alerted on the fender. Correct. I apologize. I didn't hear you before the dog alerted. He did not say before the dog alerted. It was after the dog alerted.  And he went over and then. To my recollection and viewing the video, he went over and pointed out where it was in the saddlebag on his bike. That's correct. Police officers see the bullets. That was at the first part of the initial contact with Sheriff Carpenter. That's when they, they saw the bullets and he was moved away from the vehicle and searched for safety. Right. So, so you don't, you don't have any objection to the first for the safety of the officer. Right. Of Mr. Dad is man. When he was pulled away from the bike, that seems reasonable. But once he was removed. How long did that take? After the initial contact and he was moved away, I believe that that part of it was just maybe one minute. The interaction between Sheriff Carpenter and Mr. Dad is men that we can see in view and that they've testified to is probably not more than two minutes. Everything after that is just other officers arrive, arriving and then waiting for the canine unit to arrive on the scene. So, and I don't think there's any minimum or maximum amount of time that's, you know, triggers whether he's been detained too long. It's dependent on the circumstances. And I'm saying in this case, he based on the show of authority, he didn't feel like he could leave, but they weren't doing anything further to for the purposes of the stock. They already had the information that he had an invalid plate on his bike. They knew that they could have written a citation and the officer that ultimately drove away on the bike could have driven away on the bike, but that isn't what happened. They waited there till the canine needed to arrive. And if I stated, I'm not sure if I stated earlier or not, I don't think it's any dispute with the government that this was all the whole thing was really a pretext to stop. Mr. That's not unusual at all. Do you think that's odd? I mean, I can, I couldn't tell you how many cases I've had since I've been on court over 24 years where officer, because you're in a neighborhood that's high crime and drugs. And then they say, well, let's see. Oh, they crossed over the line. Stop. Oh, they didn't signal for the right turn. Stop. Matter of fact, I can take a case down. It was out of South Carolina where the police officers ultimately stopped for because they said the tent of the car, the window was too dark, but they basically said before that, they said something spooky about that car, spooky, spooky, before they even stopped them. And then later told that the registration people to hold up before you even bring the, uh, send the, uh, give me the information that I've asked for about this vehicle. And he talked to him. So this, when you talk about pretext, that's not unusual at all. What's unusual about this case? Really? Yeah. The unusual part I believe is what justifies them keeping him there for either between six and a half or 10 minutes, whatever it's determined to be. And I don't think it matters if it's six minutes or 10 minutes, it's just why is he, he detained there longer than necessary for the circumstances that precipitated this traffic stop. Before you go, can I just ask a quick question about the record? Um, there are these references to the tips that the police officers had when they pulled your client over. Is, is there, is the nature of those tips in the record somewhere? Not to my knowledge, Your Honor. Thank you.  If the court has nothing for everyone, I'll, I'll mute until rebuttal. Thank you, counsel. Thank you, Mr. Warner. Um, good morning. I'm Steven Warner. I'm an AUSA in the Northern district of West Virginia. We're stationed in the Elkins division. Um, good morning. Good morning, Mr. Stravoulakis. And may it please the court. This case is not, it's not about a traffic stop delayed to wait for the arrival of a K-9. Why not? Sheriff Carpenter didn't even ask for the K-9. He didn't ask for the K-9. The K-9 only arrived because another officer in a different, in a different police agency, the Philippine police department, not the sheriff's department, heard radio traffic. Um, it's not common in Philippi, Barber County in Philippi, for people to help each other. But the police chief heard radio traffic that there had been a traffic stop on Datasmith, and the police chief ordered his K-9 to go to the scene to assist. The sheriff who made the stop did not ask for the drug dog. Did he know the drug dog was coming? At some point in the record, he said that he heard in radio traffic as he was there from his car that a drug dog was coming. Are you asserting now, and I think this would be for the first time, for the district court and not in your briefs, that the people on the scene were not waiting for a drug dog? I am asserting that, yes. Did you say that to the district court or in your written brief? Because this is the first I'm hearing about it. I think it is in my brief that Sheriff Carpenter did not ask for the K-9. Right, but I'm asking a different question. I don't care who asked for the K-9. I care whether the officers on the scene were waiting for a K-9. And if it's your position that they weren't, I'm curious as to why this is the first we're hearing about it. Well, I think I said in my argument, and the district court found, that the sheriff stopped the car with the intention of impounding the motorcycle. So this is a case... Just before we move on, is your position today that the people who were holding Mr. Dadisman at the side, or I guess it was in a gas station, were not waiting for a K-9? They were all surprised when the dog showed up. Is that your position? No. They knew the dog was coming. Well, they were talking to Dadisman about drugs during this six and a half minute interval, weren't they? There's no evidence in this record that they were talking about the mission of the stop. In other words, we've got an impounded vehicle. These are the next steps when you have an improper registration. I need to fill out a citation. None of that. They were talking to him about drugs. Absolutely correct. Yes, Your Honor. So what do we do in a case like this, Mr. Warner, when it's the government's burden to show that the officers were carrying out the mission of the stop? And the mission of the stop was the improper registration and the need to impound the vehicle. And the record is pretty much silent on what they were doing after they did the record check on the gun. How do we deal with that analytically? Okay. The motorcycle is stuffed with baggages. There's, I think, evidence in the record that it was three feet high with stuff on the back of the motorcycle. It's not that easy just to impound the motorcycle. Do we know that from this record? There definitely is a comment in the record, I think in maybe my second response, that it was three feet high with stuff. No, no, but there's nothing in the record about an impoundment procedure or steps that were taken to impound the motorcycle or anything like that. There's nothing in the record saying that their usual practice would be to impound the motorcycle or that their usual practice would be that they wouldn't let the rider off even if it takes an hour to impound the motorcycle. Why does he have to wait? There's nothing in the record about any of that. Well, here's what I'd like to leave you with, and I hope this answers your question. I would argue and propose to you that it's not that easy. The sheriff, the court found, and the district court found, the sheriff intended to impound the motorcycle. And we're talking about taking a motorcycle from an armed drug dealer in a public parking place. The district court, if I read them right, said that it took 3 1⁄2 minutes to do a protective sweep, make sure that the defendant wasn't within grabbing distance of a gun, get the scene under control, and then another 6 1⁄2 minutes waiting for the drug dog. And so my question is, what accounts for that 6 1⁄2 minutes? Because I don't think I argued that the scene was ever safe. And I wouldn't argue that at all today. Where was Mr. Dadisman after the first 3 1⁄2 minutes while you were waiting for the drug dog? Somewhere within 10 feet of the motorcycle. But you'd already swept the motorcycle. You've frisked him. He doesn't have a gun. You've swept the motorcycle. There was a gun, but now it's under police control. No, no. The officer did a very limited search to specifically where Dadisman said there would be a gun in the motorcycle. Period. But only the one specific area where Dadisman said there would be a gun. So you thought there were other guns on the motorcycle, but you didn't look for them. Because I thought you conducted a protective sweep under long of the motorcycle. Is it your position that the police officers on the scene thought there were additional guns on the motorcycle, but they left Mr. Dadisman within lunging space of that motorcycle nevertheless? Because that strikes me as entirely implausible. No, it's my position that it wasn't clear there was a scene just because one gun was taken from a saddlebag. This is a public place. Was there a co-conspirator? Can I just ask you a quick question? It seems to me that the reason we are here today is because the district court applied the wrong standard here and didn't make any of the factual findings that would be necessary to validate what happened here. The district court didn't apply Rodriguez. It didn't make a finding as to whether this stop extended beyond what was required to carry out the nature of the stop, and it didn't make a finding as to whether there was reasonable suspicion. So how are we supposed to do all of this on appeal for the first time? Well, the district court found that the officer intended to impound the motorcycle, and if that could not be done in a 10-minute period, had the officer... You think the district court found that there was not time to... So you believe that the district court somewhere in here found that this stop was not extended beyond what was required to meet the needs of the traffic stop? Can you give me the JA page for that? I can't, Your Honor, but I would say... The district court didn't find that. The district court found the motorcycle was not free to leave. The motorcycle was not going to leave. The district court did find that. The drug dog could have hit the next day at the impound lot. I would argue to you that it's not about a drug dog case. It's about impounding that motorcycle. But that's not what the district court said. The district court just said 10 minutes isn't that long. The district court applied the standard from McBride, which does not apply to traffic stops. It applies to a Terry stop because you have reasonable suspicion of ongoing criminal activity, and under those circumstances, the stop can't last longer than necessary. It applied that standard where it doesn't... It was supposed to be applied, and it didn't apply, Rodriguez, and it didn't make the factual findings we need. Because the court found that the motorcycle was to be impounded upon the inception of the stop, so the motorcycle was already in the police custody from the inception of the stop. Well, if the motorcycle was here making the case, that would be highly relevant, but instead, Mr. Dadisman is here making the case, and I'm just not... I don't... Can you... I mean, I just... I may be really misunderstanding your argument, but is there somewhere in this district court opinion that applied the Rodriguez standard, the two prongs? Was this stop extended beyond what was required to take care of the traffic stop? And if so, was there reasonable suspicion? I just can't find it. No, the court found that the police intended to impound the motorcycle, and I would argue that at that point, in the beginning of the stop, the motorcycle... Right, but was the court confusing impounding the motorcycle to Mr. Dadisman? Those are two different things, aren't they? In terms of the analysis that we have to apply, we're talking about the person being detained. We're not talking about the motorcycle being detained. So it seems to me that the court kind of got off on the wrong track on page... I guess it's page 10 of its order. I'm not sure if I'm giving you the right page number here, but it would be JA 207, when the court was saying that the parties agreed that the motorcycle had improper plates and that Dadisman could not have driven it away. Under these circumstances, the period of delay was reasonable. Well, again, that's talking about the motorcycle being detained and not Mr. Dadisman. And the court seems to think because there was a problem with the motorcycle that they still could have detained him. And aren't those two different concepts? Aren't we concerned with the detention of the person rather than the motorcycle? It isn't the side of the highway, you know, on an interstate where detention of the motorcycle would be detention of the person per se. You know, a person couldn't go anywhere if the traffic was speeding 65 miles an hour by him. But here we have a different situation where arguably he could have walked away. So it seems to me the district court kind of got on the wrong track about the impoundment of the motorcycle when he needed to talk about whether the police were pursuing the mission of the stop so as to justify the detention of Mr. Dadisman. Isn't that correct? I hear it respectfully. Or if not, why not? No, I think it is correct. I think you're correct. But I also think the defendant didn't raise as an issue below the detention of himself. I think the motions filed by the defendant down below were the detention of the motorcycle. I'd have to double check that, but I think that was the focus of the whole proceedings down below is the search of that motorcycle. Okay. So your red brief, your brief before us, argues primarily that there was reasonable suspicion to justify the stop, and then in one sentence says also the length of the detention was not more than necessary to impound the motorcycle, as Carpenter intended. I actually read your brief to be giving that one up, and properly so, because there's a difference between the motorcycle and Dadisman, and arguing the reasonable suspicion point, but you believe you preserved the sort of initial question as to whether this stop extended beyond what was required to satisfy the needs that go along with the traffic stop? Because I don't really see it preserved in your brief, because you know our passing shot doctrine, you can't say something in one sentence and not actually argue the point.  No, it was a question. Do you think you have preserved that argument in front of us? I think I have. I think in the briefs it's out, even if it's one sentence in the end. I think the focus is, my argument in the focus is that the decision to impound was at the inception, and the case should be over at that point. Counsel, you alluded to, you said the dog could have hit on the motorcycle the next day. You suggested it was inevitable discovery? No, I wouldn't make that argument. I wouldn't make the inevitable discovery argument. It's not that easy to make that one. You didn't make that in the district court, or on brief here. No, you didn't make it here, but if you said the impoundment is justified, why wouldn't it be your case that it's inevitable discovery? Like you said, because that's what we talked about, suppressing the evidence that came from concealing the bike, right? That's right. When you impounded, then the dog could have done what he wanted to do. That's right. There would have been a duty to itemize the evidence that they impounded. Why do you think that would not have been a strong argument for you? I think it would have been a strong argument. Yeah, I wonder why you didn't argue that. You didn't though. And this court has said you have to make the argument in order to prevail on the argument. In other words, that's not an alternate basis for affirmance if you didn't make it. No, I didn't make the inevitable discovery argument below. No, I did not. Okay, nothing further than that. No, I've got questions.  Are you aware of anything in the record about the nature of these tips? Your argument in your brief is that there was reasonable suspicion that he was dealing drugs before he was stopped. And so you base that largely on the tips. And I'm wondering whether there is anything in the record about the nature of those tips. There's not. It caused the sheriff to believe he was a quote big player in the drug business. But we don't know. That's the evidence. Yeah, okay. Is there some reason that nothing was put into the record about sort of, the fact that the district court applied the wrong standard wouldn't necessarily mean we couldn't affirm if there was sort of stuff in the record that would allow us to apply the right standard. But I can't find anything about the nature of the tips. I can't find anything about standard practice in a case like this, whether it is in fact true that they would impound the motorcycle. And if so, how that would work, how long it would take, whether they would require the owner of the car or the motorcycle to wait for the duration of the impoundment. There's just nothing in the record. What happened here? You're right about that, yeah. There's nothing more about the tips and we did not develop impoundment or inevitable discovery. It's a question, why is the record so thin in this case? Well, I think the focus of the whole, I know the focus of it was the danger to the police at the time that they made the stop. Within 62 seconds of, they know this defendant has a gun and there are tips that he's a drug dealer. And they're in a public place with people walking. There could be another, a second weapon. There could be a weapon on his, hidden. There could be a co-conspirator in the crowd walking in the parking lot. Why didn't they just secure him? I mean, the police are entitled to do so many things to secure a scene if it's dangerous. They could have put him in the back of a squad car. Like, I don't understand. If they thought it was dangerous and an unstable scene, why did they leave him standing within 10 feet of the motorcycle? Why didn't they engage him in the back of a squad car? I've just never heard of a case like this where the police have a concern about the stability of the scene. The law gives them so many steps they can take to protect themselves and bystanders. They didn't take any of them here. Why not? If they were worried about that. Because I think Sheriff, I would argue that Sheriff Carpenter did a very good job in a public place to keep the peace and calm down when he wrote in on the issue. Within three minutes, he knows that this man has a gun, at least one gun, and that he's a drug dealer. I would argue to you that Sheriff Carpenter did a nice job of keeping it calm in a public place without having a scene and waiting for the rest of the officers as they all finally came in. But I would argue that Sheriff Carpenter did a very nice job of keeping the peace in that scenario, in that public place. Mr. Warner, what was the West Virginia code section under which Mr. Dadisman was stopped? It is in the magistrate's report and recommendation. The code section is cited 17-7. Right. And the reason why I'm asking you for a particular code section is, does West Virginia treat it as a criminal offense or purely a traffic infraction? I believe it's a criminal offense and I used to do that defense work before. So I would want to look at the book again, Your Honor, but I think it's a criminal offense for which you could go to jail for. So you're saying you could go to jail in West Virginia for having an improper registration? I would want to look at that. It's been 25 years since I've done state court work and I didn't look at that statute before coming in, the penalty on that. But it is cited in the magistrate's report and recommendation. Okay. And on a different subject, you do agree it's the government's burden to make the record that the officers were pursuing the mission of the stop? Yes, ma'am. Okay. Okay. All right. Thank you. Thank you, Counsel. Counsel, you have time reserved. May it please the court. I did reserve five minutes, but based upon the exchange during Mr. Warner's portion, I would rely on that, but leave myself open for questions if any of you have any questions of me. Let me ask you one question, Ms. Stavroulakis, and that is, is there an option for this court to remand this case, to ask the judge to conduct the analysis that should have been conducted, or is it your position that it's a one-shot deal, the state had its chance, and remanding for the proper analysis is not within the scope of the appellate procedure here? I think that the court can remand for appropriate proceedings, but we would argue that the court could look at the record as it stands and make their own determination, that there wasn't a factual basis in this case or a reasonable suspicion to detain Mr. Dadisman any longer on the scene.  All right. Nothing further? All right. Counsel, we note that you were caught upon it, and on behalf of the Fourth Circuit, I'd like to note that and a special thanks to you, and we rely on lawyers like yourself to take these cases, and we appreciate it very much. Thank you, Your Honor, I appreciate it. And obviously, Mr. Warner, we appreciate your representation of the United States. We'll come down to Greek Council and proceed to our next case. We'll have to give you a virtual high-five. Thank you, Your Honor.
judges: Roger L. Gregory, Pamela A. Harris, Barbara Milano Keenan